Patti PATTERSON, M.D., Interim Com-
missioner of Health, in her official ca-
pacity, William Reyn Archer, recently
appointed Commissioner of Health, in
his official capacity, and the Texas De-
partment of Health, Appellants,

v.

**PLANNED PARENTHOOD OF
HOUSTON AND SOUTHEAST
TEXAS, INC., Appellee.**

No. 97–0889.

Supreme Court of Texas.

Argued Feb. 4, 1998.

Decided June 23, 1998.

Edward P. Watt, Daniel R. Castro, Austin,
Kelly J. Shackelford, Dallas, Dedra L. Wil-
burn, Dan Morales, Toni Hunter, Laquita A.
Hamilton, Austin, for Appellants.

Martha S. Dickie, David C. Duggins,
Charles R. Burton, Austin, for Appellee.

HANKINSON, Justice, delivered the
opinion of the Court, in which PHILLIPS,
Chief Justice, and HECHT, ENOCH,
SPECTOR, OWEN, and BAKER, Justices,
joined.

On direct appeal, the Texas Commissioner
of Health asks us to reverse the judgment of

the trial court declaring rider 14 to the 1997–1999 Department of Health family planning appropriation to be unconstitutional. The rider forbids the use of state funds to dispense prescription drugs to minors without parental consent. Planned Parenthood challenged rider 14 on the grounds that it conflicts with federal law and violates the unity-in-subject clause of the Texas Constitution. Because we determine that the challenge to rider 14 is not ripe, we vacate the trial court's judgment and dismiss this case for want of jurisdiction.

The State of Texas voluntarily participates in four federal programs that provide funds for family planning services: (1) Title X of the Public Health Service Act, 42 U.S.C. § 300, which provides project grants to public and private agencies for family planning services; (2) Temporary Assistance to Needy Families, 42 U.S.C. § 701 (TANF, also known as the Welfare Reform Act), which provides grants to the states to assist needy families; (3) Title XIX of the Social Security Act, 42 U.S.C. § 1396 (Medicaid), which provides medical care to the needy through a cooperative federal-state program; and (4) Title XX of the Social Security Act, 42 U.S.C. § 1397, which provides block grants to the states for social services, including family planning. The funds from these four programs compose the state's family planning appropriation, identified in the General Appropriations Act as Department of Health Strategy D.1.2. See General Appropriations Act, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 5663. The federal government is the sole source of funds for all the programs except Medicaid. As a voluntary participant in the Medicaid program, the state agrees to match every nine dollars of federal funds with one dollar of state funds. See 42 U.S.C. § 1396b(a)(5). In 1997 the legislature appropriated approximately $93 million for family planning services for each year of the coming biennium, with approximately $5.4 million per year representing the state's required matching funds for Medicaid. In 1997 the legislature also attached rider 14 to the family planning appropriation, declaring that "no state funds may be used to dispense prescription drugs to minors without parental consent." General Appropriations Act,

75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 5675.

As part of its family planning services, plaintiff Planned Parenthood of Houston and Southeast Texas, Inc., provides prescription medication, including contraceptives and drugs for treating sexually transmitted diseases, to minors without requiring parental consent. Planned Parenthood contracts with the state to receive funds for these services under Title X, Title XX, and TANF. Planned Parenthood is also an enrolled Medicaid provider, and is reimbursed on a fee-for-service basis by the Department of Health (through an insurance program) for the family planning services it provides to Medicaid-eligible individuals. The federal regulations governing these programs have been interpreted to proscribe the imposition of a parental notification or consent requirement. See New York v. Heckler, 719 F.2d 1191, 1196 (2d Cir.1983) (invalidating federal regulation requiring parental notification of prescription contraceptives as unauthorized by Title X); Planned Parenthood Ass'n v. Schweiker, 700 F.2d 710, 722 (D.C.Cir.1983) (explaining that federal regulations forbid state from denying Title X services to minors who lack parental consent); T___ H___ v. Jones, 425 F.Supp. 873, 878 (D.Utah 1975), aff'd in part, 425 U.S. 986 (1976) (invalidating state parental consent requirement for family planning services as conflicting with federal welfare and Medicaid requirements).

Concerned about what it perceived to be a conflict between the federal program rules' forbidding a parental consent requirement and rider 14's explicit parental consent requirement, Planned Parenthood asked defendant Texas Department of Health about the Commissioner of Health's opinion on the effect of rider 14 on family planning funds. The Department of Health and its commissioner are charged with administering and distributing funds the legislature appropriates for family planning services. The Commissioner in turn requested an opinion from the United States Department of Health and Human Services (DHHS). A regional health administrator for DHHS replied by letter that, in his view, rider 14 "is, on its face, inconsistent with the applicable Title X fami-

ly planning legislative authority and implementing regulations. Because the Title X Family Planning Program operates under total budgeting principles, if this Rider is fully implemented, the Texas Department of Health would be ineligible to receive Title X funding." The concept of "total budgeting principles" means that if a family planning program receives any money through Title X, Title X regulations apply to all of the funds in that program, "including but not limited to grant funds, grant-related income or matching funds." 42 C.F.R. 59.2 (1997).

In light of this express suggestion that Texas might lose its federal family planning funds, Planned Parenthood filed this action against the Department and its commissioner seeking a declaration that rider 14 is unconstitutional. It alleged that the rider violates the Supremacy Clause, Article 6, Clause 2, of the United States Constitution by imposing a parental consent requirement in conflict with federal law, and violates the unity-in-subject clause, article III, section 35, of the Texas Constitution by amending or repealing certain provisions of the general law in an appropriations act.

At trial before the court, the parties stipulated to a number of facts, including that "[e]ffective September 1, 1997, Planned Parenthood will no longer be eligible to receive Medicaid funds for providing prescription medication to minors without consent." Planned Parenthood called as its sole witness Carol Pavlica, the director of the family planning program for the Department of Health. She explained that although the Department had not yet made any final or official decisions, it was considering two plans in its efforts to implement rider 14. Under the first plan (identified by the parties as "Plan A"), the state would simply require all minors receiving prescription drugs from family planning programs to have parental consent. She acknowledged that in her opinion this plan would jeopardize all federal family planning funds.

To avoid potentially jeopardizing federal family planning funds, the Department was considering a second plan ("Plan B"). Under Plan B, the state would continue to pay for prescriptions to minors without parental con-

sent, but would pay for those prescriptions with federal funds other than Medicaid funds (Medicaid being the only program with a matching state component), including prescriptions for Medicaid-eligible minors. Thus under this plan, in Pavlica's opinion, the state could comply with the legislature's dictate that no state funds be used to dispense prescription drugs to minors lacking parental consent, without violating the federal rules that receipt of family planning services cannot be conditioned on parental consent, or jeopardizing other federal family planning funds. She made clear that under Plan B, neither Planned Parenthood nor its minor clients (including those eligible for Medicaid) would suffer any change in requirements, services, or funding; in other words, the state does and will continue to pay for prescriptions for minors even if they lack parental consent, but from federal funds without a state matching fund component. She also testified she believed the state would not be jeopardizing its federal funds by implementing Plan B because the state would not in fact be imposing a parental consent requirement.

The trial court declared rider 14 unconstitutional on the bases that (1) it conflicts with the federal laws governing the four federal programs in the family planning appropriation, and (2) it violates article III, section 35, of the Texas Constitution by attempting to repeal or amend certain provisions of Chapter 32 of the Texas Human Resources Code. The court rendered judgment enjoining the Commissioner from implementing rider 14. It also issued detailed findings of fact and conclusions of law.

Under federal law, the trial court concluded that the rules governing the federal family planning programs in which the state participates forbid imposition of parental consent requirements, and preempt any state law to the contrary that would affect programs drawing on those federal funds. Although the trial court termed it "an admirable effort" to comply with both federal law and rider 14, the court concluded that the Department's proposed plan to track prescriptions and payments (Plan B) and use federal funds without a state matching component to

pay for prescriptions without parental consent would not avoid the conflict with federal law: "While a state can restrict the use of state money appropriated solely for state purposes, a state cannot restrict the use of state money appropriated to match federal money. Under federal law, matching money must come without restrictions or it is not matching money."

Under Texas law, the trial court rejected Planned Parenthood's assertion that the rider amended or repealed Chapter 32 of the Family Code (permitting consent by a nonparent to treatment of a minor under certain circumstances), but ruled that it did amend or repeal certain provisions of Chapter 32 of the Human Resources Code (governing the state's medical assistance program for needy individuals). It determined that section 32.024(a) of the Human Resources Code requires the Department of Health to provide medical services to the needy in accordance with federal law, and section 32.031(b) authorizes the Department to spend state funds to do so. Thus the trial court concluded that the rider unconstitutionally amended general law by bringing the state out of compliance with the federal rules governing family planning funds: "Texas has chosen in its own general law to spend its funds consistent with federal law, and a rider cannot amend or repeal that general law." The trial court also concluded that Planned Parenthood had standing to bring its claims because it receives part of the funds that the state is placing at risk by enforcing a rider in conflict with federal law, and that even the Department's proposed plan to use federal funds without a state matching component did not resolve that conflict. Based on the letter from DHHS, the court concluded that "[t]his threatened cut-off of federal funds—which directly threatens Planned Parenthood—is sufficient to give Planned Parenthood standing to force compliance with the law." The court also premised standing on its finding that the administrative costs of implementing Plan B would be paid for with funds that would otherwise be available to Planned Parenthood to assist needy individuals.

■ While the trial court framed this issue as one of standing, we view it more precisely as one of ripeness. Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction, *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex.1998), and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented. *See* DAVIS & PIÉRCE, II ADMINISTRATIVE LAW TREATISE, § 15.12, at 361 (3d ed. 1994) ("In many cases the two problems of standing and ripeness are merged; a party may lack standing because what has happened to him is not far enough developed, but the lack of development may be the essence of unripeness."). But if standing focuses on the question of who may bring an action, *see Barshop v. Medina County Underground Water Conservation Dist.*, 925 S.W.2d 618, 626–627 (Tex.1996), ripeness examines when that action may be brought. At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote. *See* Nichol, *Ripeness and the Constitution*, 54 U. CHI. L.REV. 153, 169 (1987); 13A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 3532.1, at 130 (2d ed.1984). Ripeness thus focuses on whether the case involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." WRIGHT, *supra*, § 3532, at 112. By maintaining this focus, the ripeness doctrine serves to avoid premature adjudication. While the standing doctrine has been much criticized, ripeness, especially in its pragmatic focus, has found the approval of commentators. *See, e.g.,* Mansfield, *Standing and Ripeness Revisited: The Supreme Court's "Hypothetical" Barriers*, 68 N.D. L.REV. 1, 19–20 (1992); WRIGHT, *supra*, § 3532, at 112 ("As compared to standing, ripeness decisions have developed a generally satisfactory method for resolving the problems of prematurity.").

The constitutional roots of justiciability doctrines such as ripeness, as well as standing and mootness, lie in the prohibition on advisory opinions, which in turn stems from the separation of powers doctrine. *See* TEX. CONST. art. II, § 1 (separation of powers), art. IV, §§ 1, 22 (attorney general is part of the executive department, and is empowered to issue advisory opinions to the governor

and other officials), art. V, § 8 (district court jurisdiction); *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 444 (Tex.1993) (explaining that "we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department"); *Morrow v. Corbin*, 122 Tex. 553, 62 S.W.2d 641, 646 (1933) (explaining that under the constitution, appellate court jurisdiction does not extend to issuing advisory opinions); *see also Farmers Tex. County Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex.1997) (reviewing justiciability principles in light of 1985 constitutional amendment to district court jurisdiction).

■ The courts of this state are not empowered to give advisory opinions. *Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624, 628 (Tex.1987); *United Servs. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 859 (Tex.1965); *Alamo Express v. Union City Transfer*, 158 Tex. 234, 309 S.W.2d 815, 827 (1958). This prohibition extends to cases that are not yet ripe. *See Camarena v. Texas Employment Comm'n*, 754 S.W.2d 149, 151 (Tex.1988); *Public Util. Comm'n v. Houston Lighting & Power Co.*, 748 S.W.2d 439, 442 (Tex.1987); *City of Garland v. Louton*, 691 S.W.2d 603, 605 (Tex.1985); *California Prod., Inc. v. Puretex Lemon Juice*, 160 Tex. 586, 334 S.W.2d 780, 783 (1960). A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *See Camarena*, 754 S.W.2d at 151 (holding trial court could not grant relief based on "a hypothetical situation which might or might not arise at a later date. District courts, under our Constitution, do not give advice or decide cases upon speculative, hypothetical or contingent situations").

■ The concerns addressed by the ripeness doctrine encompass more than a question of constitutional prohibition. The doctrine has a pragmatic, prudential aspect that is directed toward "[conserving] judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Mayhew*, 964 S.W.2d at 928; *see also* Nichol, *supra*, at 174 ("ripeness

analysis carries the banner of prudence rather than power"). Refraining from issuing advisory opinions and waiting for cases' timely factual development is also essential to the proper development of the state's jurisprudence. *See* Entman, *Flawed Activism: The Tennessee Supreme Court's Advisory Opinions on Joint Tort Liability and Summary Judgment*, 24 MEM. ST. U.L.REV. 193, 199 (1994); Frankfurter, *A Note on Advisory Opinions*, 37 HARV. L.REV. 1002, 1002–03 (1924). "Litigation based upon hypothetical possibility rather than concrete fact is apt to be poor litigation. The demand for specificity, therefore, stems from a judicial desire for better lawmaking." Nichol, *supra*, at 177; WRIGHT, *supra*, § 3532.3, at 147 ("adjudication may be postponed until a better factual record is available, '[e]ven though the challenged statute is sure to work the injury alleged.'") (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 300, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)). Moreover, avoiding premature litigation prevents courts from "entangling themselves in abstract disagreements over administrative policies" while at the same time serving to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *City of El Paso v. Madero Dev. & Constr. Co.*, 803 S.W.2d 396, 398–99 (Tex.App.—El Paso 1991, writ denied) (citing *Abbott Lab. v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)); *see also* DAVIS & PIERCE, *supra*, § 15.12, at 360 (explaining that ripeness law "limits the ability of courts to intrude excessively on the policymaking domains of the politically accountable [branches of government]"); Nichol, *supra*, at 178 (similarly noting that ripeness doctrine "allows the courts to postpone interfering when necessary so that other branches of government ... may perform their functions unimpeded").

■ We examine the ripeness of Planned Parenthood's claims in light of these principles. Planned Parenthood argues that any implementation of rider 14 will result in it losing federal funds, at the very least those provided through Title X. Thus Planned Parenthood urges that it is in immediate danger

of sustaining some direct injury because of the Department's planned implementation of rider 14. Planned Parenthood further argues that it is unclear whether the Department can legitimately separate federal and state funds, and that even if the Department can lawfully implement such a plan, Planned Parenthood is harmed by the administrative costs of implementation.

The record does not support Planned Parenthood's assertions. Pavlica, the sole witness, explained that the Department had not finalized its plans, but was leaning to Plan B, and had only just begun investigating what automation demands Plan B might require. She emphasized that Planned Parenthood and its clients would experience no change in actual services provided or paid for under Plan B, but that only the funding source for some of the prescriptions would change. She testified that the Department would not in fact require parental consent before paying for prescriptions to minors under Plan B: "We would not change the parental consent requirements so minors would continue to be served." The letter from DHHS does not specifically address Plan B, but refers to rider 14 "*on its face*," states that Texas may be ineligible to receive Title X funds "*if* [rider 14] is fully implemented," and clearly assumes that parental consent will be required before any drugs are prescribed. (Emphasis added.) Nothing in the record demonstrates that the federal government has actually considered Plan B, much less suggested revoking or withdrawing funding based on it. Likewise, no evidence supports the trial court's conclusion that the administrative costs of implementing Plan B would come from family planning program funds that would otherwise have gone to Planned Parenthood, or even the actual amount of what those administrative costs would be. Pavlica testified that although she was "not exactly sure" what the administrative costs might be, based on her experience, she "would guess ... [that] it would be several hundreds of thousands of dollars" to segregate the funds. She did not suggest or even speculate about where the administrative funds would come from. This testimony is not specific enough to support the conclusion

that harm to Planned Parenthood is imminent.

This is precisely the kind of case in which resolution of the claim presented depends on the occurrence of contingent future events that may not occur as anticipated or may not occur at all. We simply do not know what the federal government will do if the state carries out its plan to segregate the funds, and the record does not even demonstrate what exactly the state will do. Without knowing what the federal government will do, Planned Parenthood cannot show a conflict between federal and state demands or that the state's proposed action will cause it any injury. While Planned Parenthood does not have to wait until its funds are actually revoked or cut off, its potential injury must be more certain; the threat must be established by something more definite than the DHHS letter presented in this case, which does not address whatever final action the Department of Health may take to meet its statutory obligations to the legislature and Congress. Because its alleged injury remains contingent, Planned Parenthood's claim is not yet ripe for review.

The essence of the ripeness doctrine is to avoid premature adjudication of just such a situation; to hold otherwise would be the essence of an advisory opinion, advising what the law would be on a hypothetical set of facts. Neither this Court nor the trial court has the power to do so. Accordingly, we vacate the trial court's judgment and dismiss this case for want of jurisdiction.

GONZALEZ, J., filed a concurring opinion, in which ABBOTT, J., joined.

GONZALEZ, Justice joined by ABBOTT, Justice, concurring in the judgment.

I concur with the Court that the challenge to rider 14 is not ripe. I write separately to address the threshold issue the Court leaves open—whether Planned Parenthood has standing to challenge rider 14, even assuming the case is ripe. I would dismiss the case because Planned Parenthood lacks standing either in its own right or on behalf of the minors of the State of Texas.

In Texas, "[a] two-part test governs whether a plaintiff has standing to challenge a statute." *Barshop v. Medina Underground Water Conservation Dist.*, 925 S.W.2d 618, 626 (Tex.1996). First, the "plaintiff must . . . suffer some actual or threatened restriction under that statute." *Texas Workers' Compensation Comm'n v. Garcia*, 893 S.W.2d 504, 518 (Tex.1995). "Second, the plaintiff must contend that the statute unconstitutionally restricts the plaintiff's rights, not somebody else's." Id.

Planned Parenthood maintains that rider 14 "unconstitutionally restricts its own rights" in two ways. First, if the United States Department of Health and Human Services (DHHS) determines that Texas Department of Health's implementation of rider 14 will result in a loss of federal family planning funds, then Planned Parenthood "will not be able to subsidize all the costs of providing expensive prescription drugs to minor patients who cannot obtain parental consent." Second, even if the DHHS is satisfied that "Plan B" does not violate federal regulations, Planned Parenthood claims it is harmed by the administrative costs expended to implement Plan B. However, Planned Parenthood fails to identify the source of its "right" or "entitlement" to Texas tax revenues or to the most efficient and cost-effective administration of those tax revenues.

In *Texas Association of Business v. Texas Air Control Board*, 852 S.W.2d 440 (Tex. 1993), we held that "[t]he standing requirement stems from two *limitations* on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision." *Id.* at 443 (emphasis added). The open courts provision provides:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

TEX. CONST. art. I, § 13. We held that this provision "contemplates access to the courts *only for those litigants suffering an injury.*" 852 S.W.2d at 444 (emphasis added). This provision, which authorizes the courts to remedy injuries done in one's "lands, goods, person or reputation," implicitly defines the bounds of potentially justiciable issues. *Cf.*

*Baptist Mem'l Hosp. Sys. v. Arredondo*, 922 S.W.2d 120, 121 (Tex.1996) (recognizing that under the open courts provision, the legislature may limit a cause of action unless it unreasonably restricts "a well-recognized common law cause of action"). For a plaintiff to have standing, it must demonstrate that it at least arguably has some legal or liberty interest grounded in the constitution, a statute, or the common law. *See Spring Branch I.S.D. v. Stamos*, 695 S.W.2d 556, 561 (Tex.1985) ("A property or liberty interest must find its origin in some aspect of state law.").

Planned Parenthood, therefore, must have some arguable basis for asserting that rider 14 abrogates some legal or liberty interest of its own. Planned Parenthood has not alleged that rider 14 abridges any common law right arising under property, tort, or contract law. It has not identified any fundamental right to state subsidization, *see Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, indeed, have a legitimate claim of entitlement to it."), or to the most efficient and least wasteful administration of the state's health care resources. *Cf. Flast v. Cohen*, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) ("[To establish Article III standing] [i]t will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute."). Generally, a state's choice of whether to fund a particular program or the efficiency of its administration is not actionable. Furthermore, Planned Parenthood does not identify any implicit right or entitlement owing it under the Texas Constitution or the Texas Human Resources Code abridged by rider 14, even if federal funds are cut off.

The unity-in-subject clause of the Texas Constitution does not, by itself, provide Planned Parenthood any legal or liberty interest. *See* TEX. CONST. art. III, § 35. This Court has previously invalidated riders as void under Section 35 of Article III of the Texas Constitution, but only where the plaintiff asserted an otherwise protected interest.

In *LeCroy v. Hanlon*, 713 S.W.2d 335, 338 (Tex.1986), for example, this Court held that sections of an omnibus fee bill increasing filing fees violated the "caption requirement" of Article III, Section 35. However, the plaintiff's standing to raise this claim was not in doubt because he claimed that the filing fees burdened his personal, constitutional right to open courts. *See id.* at 337. In *Moore v. Sheppard*, 144 Tex. 537, 192 S.W.2d 559, 562 (1946), this Court held that an amendment to an appropriation bill directing that fees paid to clerks for either official or unofficial documents be deposited with the State Treasury violated the unity-in-subject clause. There, the plaintiffs' standing was also not in question, because they had an arguable property interest in the compensation they received "for [services] that they [had] no obligation, under the law, to perform." *Id.* at 560.

Planned Parenthood asserts that rider 14 conflicts with the purposes of Section 32 of the Human Resources Code. That section provides, in pertinent part, that:

(a) This chapter shall be liberally construed and applied in relation to applicable federal laws and regulations so that adequate and high quality health care may be made available to all children and adults who need the care and are not financially able to pay for it.

(b) If a provision of this chapter conflicts with a provision of the Social Security Act or any other federal act and renders the state program out of conformity with federal law to the extent that federal matching money is not available to the state, the conflicting provision of state law shall be inoperative to the extent of the conflict but shall not affect the remainder of this chapter.

TEX. HUM. RES.CODE § 32.002. This section provides indigent children and adults with a statutory interest in maintaining the flow of federal health care funds, but it does not give Planned Parenthood, a conduit for these taxpayer-supported services, a similar statutory interest. The statute's purposes are directed to the beneficiaries of the state and federal funds, not to fund Planned Parenthood's budget.

What the Legislature gives the Legislature can take away. The adults and children deprived of further entitlements may have a remedy if the process by which the Legislature terminates them does not accord with due process. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 263–64, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (holding that procedural due process requires that evidentiary hearing be held before public assistance payments to welfare recipients are terminated); *Goldsmith v. United States Bd. of Tax Appeals*, 270 U.S. 117, 123, 46 S.Ct. 215, 70 L.Ed. 494 (1926) (holding that Board's refusal to admit petitioner to the practice of law without a prior hearing or statement of reasons for denial violated due process). Planned Parenthood has no standing in its own right to challenge rider 14's alleged conflict with the provisions of the Texas Human Resources Code.

In its Original and First Amended Original Petition, Planned Parenthood argued that it has standing to represent the interests of the minors of the State of Texas. Under Texas law, however, only the parents or guardians of a minor may represent their legal interests. *See* TEX. FAM.CODE § 151.003(a)(7). Planned Parenthood is not the surrogate parent of Texas's minor children. Its status as an advocacy organization for certain rights of minors (e.g., access to contraceptives without parental consent) does not confer it standing. *See, e.g., Texas Dep't of Mental Health and Mental Retardation v. Petty*, 778 S.W.2d 156, 163–66 (Tex.App.—Austin 1989, writ dism'd w.o.j.) (holding that Advocacy, Inc., a nonprofit advocacy organization for the rights of the mentally disabled, lacked standing to sue on behalf of the rights of the mentally disabled).

The question of Planned Parenthood's standing to represent the minors of the state of Texas obscures the larger issue underlying this case—parental rights. The purpose of rider 14 was to withhold state funds from a program that, as currently implemented, interferes with parental supervision over the health care and sexual behavior of minor children. Indeed, Planned Parenthood's policy of providing minors prescription drugs without parental consent, for which it seeks this state's subsidies, is inconsistent with Texas law. Section 151.003(a)(6) of the Texas Family Code provides, in pertinent part:

(a) A parent of a child has the following rights and duties:

...

(6) *the right to consent* to the child's marriage, enlistment in the armed forces of the United States, *medical and dental care, and psychiatric, psychological and surgical treatment....*

TEX. FAM.CODE § 151.003(a)(6) (emphasis added).

The importance of parental involvement in minors' decisions to avail themselves of contraceptive or abortion services is aptly illustrated in the amicus brief of several families supporting rider 14 who unsuccessfully attempted to intervene at the trial level. The daughter of one of the individuals filing the amicus brief was impregnated on two separate occasions by her mother's boyfriend while she was living with her mother. Both times, the live-in boyfriend took the daughter—once when she was twelve and once when she was thirteen—to an abortion clinic in order to conceal his criminal deeds. A parental consent requirement would have prevented the live-in boyfriend from being able to continue his abuse. The irony of Planned Parenthood's argument that it represents the state's minors is that when some of those minors sought to intervene to speak for themselves—through their lawful representatives—Planned Parenthood opposed their intervention.

Unlike the federal authorities the Court cites early in its opinion, other courts, including our own, have strongly affirmed the ancient and well-established right of parents to guide and direct the decisions of their minor children. "The natural right which exists between parents and their children is one of constitutional dimensions." *Wiley v. Sprattlan,* 543 S.W.2d 349, 352 (Tex.1976). "The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Only a generation ago, this Court recognized the fundamental importance of parental rights in reaffirming the doctrine of parental immunity:

We trust that it is not out of date for the state and its courts to be concerned with the welfare of the family as the most vital unit in our society. We recognize that peace, tranquility and discipline in the home are endowed and inspired by higher authority than statutory enactments and court decisions. Harmonious family relationships depend on filial and parental love and respect which can neither be created nor preserved by legislatures or courts. The most we can do is to prevent the judicial system from being used to disrupt the wide sphere of reasonable discretion which is necessary in order for parents to properly exercise their responsibility to provide nurture, care, and discipline for their children.

*Felderhoff v. Felderhoff,* 473 S.W.2d 928, 933 (Tex.1971). These principles cannot be reiterated often enough, especially in the context of a minor's health and sex-related decisions. To grant Planned Parenthood standing to represent the state's minors would usurp this vital parental role.

Accordingly, I would hold not only that the case is not ripe, but also that Planned Parenthood has failed to otherwise establish standing to challenge rider 14.